U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2024 MAY 15  PM 4: 30

CLERK
BY _____ UW
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

MATTHEW DRUZBA, as Executor of the     )
Estate of Cecile Druzba,               )
                                       )
        Plaintiff,                     )
                                       )
            v.                         )        Case No. 2:22-cv-00019
                                       )
AMERICAN HONDA MOTOR CO., INC.,        )
                                       )
        Defendant.                     )

**OPINION AND ORDER DENYING DEFENDANT'S MOTION TO PRECLUDE
TESTIMONY OF BRIAN HERBST AND MARIUSZ ZIEJEWSKI, PHD, AND
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**
(Doc. 46)

Plaintiff Matthew Druzba, as Executor of the Estate of Cecile Druzba (the
"Decedent"), brings this action asserting strict liability for design defect and negligence
claims against American Honda Motor Co., Inc. ("AHM"). Pending before the court are
AHM's September 15, 2023 motion for summary judgment and motion to preclude
testimony of Mr. Brian Herbst ("Mr. Herbst") and Mariusz Ziejewski, Ph.D. ("Dr.
Ziejewski"), pursuant to Fed. R. Evid. 702. (Doc. 46.) On October 23, 2023, Plaintiff
filed a response in opposition, (Doc. 57), and on November 6, 2023, AHM replied. (Doc.
60.) After a hearing on November 14, 2023, the court took the pending motions under
advisement. (Doc. 62.)

Plaintiff is represented by David A. Brose, Esq., Robert B. Luce, Esq., and Samuel
R. Barnett, Esq. AHM is represented by Jacob J. Lantry, Esq., James M. Campbell, Esq.,
and Trevor J. Keenan, Esq.

I.      **Whether to Consider Plaintiff's Additional Facts.**

Plaintiff's Response to AHM's Statement of Undisputed Material Facts ("SUMF")
both responds to AHM's SUMF and contains a Statement of Additional Material Facts.
(Doc. 55.) "[T]he Local Rules do not provide an opportunity for the nonmoving party to

file a statement of *undisputed* facts at the summary judgment stage." *Rotman v. Progressive Ins. Co.*, 955 F. Supp. 2d 272, 276 (D. Vt. 2013); *see also Schroeder v. Makita Corp.*, 2006 WL 335680, at *3-4 (D. Vt. Feb. 13, 2006) (same).

Generally, the court "disregard[s] [p]laintiff's additional facts unless it is clear from the parties' briefing that those facts are both material and undisputed." *Rotman*, 955 F. Supp. 2d 276; *see also Boule v. Pike Indus., Inc.*, 2013 WL 711937, at *1-2 (D. Vt. Feb. 27, 2013) (same). AHM did not move to strike Plaintiff's Statement of Additional Material Facts but rather submitted a response. (Doc. 61.) In resolving the pending motions, the court will therefore consider the additional facts to the extent they are undisputed or identify a genuine issue of material fact.

## II.    The Undisputed Facts.

### A.    The Accident.

In the early morning of March 22, 2019, the Decedent was driving a 2013 Honda Accord LX (the "Accord") southbound on Vermont Route 22A near Addison, Vermont with Jacques Marton in the front passenger seat. Traveling northbound in a 2013 Subaru Impreza (the "Subaru"), Ian LaBounty, who had consumed narcotics the prior evening, crossed the center lane and struck the Accord (the "Accident"). In the Accident, the Accord's longitudinal change in velocity ("Delta-V") was 25 to 27 miles per hour, and its lateral Delta-V was 11 miles per hour. The parties agree that during the Accident the Decedent "moved forward and to the left[.]" *Id.* at 3, ¶ 6. The exact position of the vehicles at the point of impact is unknown.

The Decedent was taken to the University of Vermont Medical Center and pronounced dead approximately one hour after the Accident. Her cause of death was identified as "blunt force trauma to the torso." (Doc. 55 at 2, ¶ 6) (internal quotation marks omitted). Mr. Marton emerged from the Accident with a sore ribcage, and Mr. LaBounty suffered only bruises.

### B.    The Accord.

The Accord was a ninth generation Honda Accord, which encompasses model years 2013 to 2017. Plaintiff claims the Accord was defectively designed because it did

not "incorporate adequate and sufficient structure outboard of the driver's side frame rail and at the driver's door to deflect, absorb[,] and reinforce the event of impact[.]" *Id.* ¶ 8 (internal quotation marks omitted). When it developed the ninth generation Honda Accord, AHM was aware that its vehicles "could be involved in frontal crashes, including crashes where less than the full width or lap of the vehicle would be struck[.]" (Doc. 61 at 5, ¶ 16.) In the event of an accident, one objective of a vehicle design is "to generate deformation and energy absorption outside the occupant compartment and to minimize intrusion into the occupant compartment, with frontal structures deflecting impact energy by redirecting crash forces away from the occupant compartment." *Id.* at 11, ¶ 37.

The Accord model manufactured in 2013 (the "2013 Honda Accord") was tested internally and pursuant to Federal Motor Vehicle Safety Standards ("FMVSS"), as well as by the Insurance Institute for Highway Safety ("IIHS") and the National Highway Traffic Safety Administration ("NHTSA"). The 2013 Honda Accord complied with all FMVSS tests. IIHS testing included small and moderate overlap frontal crash testing in which less than the full width of the vehicle was struck. The IIHS small overlap test also had higher longitudinal and lateral Delta-Vs than found with the Accord in the Accident. In the IIHS small overlap crash test, the 2013 Honda Accord received a "Good" overall rating, the highest overall rating, as well as the highest rating available for "injury measures, driver restraints, and kinematics[,]" (Doc. 55 at 5-6, ¶¶ 18, 20) (internal quotation marks omitted), but a lower rating of "Acceptable[]" for its structure and safety cage. (Doc. 61 at 6, ¶ 19) (internal quotation marks omitted).

In designing and developing the ninth generation Honda Accord, AHM conducted a small overlap test and "established objective targets for the performance of its vehicle structure." (Doc. 61 at 6, ¶ 20.) Koji Yamada, an AHM representative, testified that "all of the objective deformation targets [with one exception] . . . were within the occupant compartment, and [AHM] did not establish any objective targets for the performance of its vehicle structure forward of the occupant compartment or on its driver's side body structure." *Id.* at 7, ¶ 21. He explained that AHM used "advanced compatibility engineering body structure" ("ACE Structure") as a "new technology" in the ninth

3

generation Honda Accord in response to IIHS' small overlap test, a design that "distribute[s] the load." *Id.* ¶¶ 22-23.

"[T]o optimize the [ACE Structure,]" *id.* ¶ 24, in order "to limit deformation of the occupant compartment and efficiently absorb energy[]" in the ninth generation Honda Accord, *id.* at 9, ¶ 30, AHM performed finite element analysis ("FEA") computer simulations that "involved increasing the grade/strength of the steel (ranging from 270-1,500 megapascals), material thickness and the shape of components[.]" *Id.* at 7, ¶ 24. In his deposition, AHM expert Harry Pearce agreed that vehicle manufacturers have used FEA for at least the last two decades in the design, development, testing, and validation of vehicle crashworthiness. He noted that other manufacturers, like General Motors, use "an iterative design process to optimize the vehicle structure through changes to the geometry, thickness[,] and material strength of each component through a continuous engineering process to get the desired performance." (Doc. 61 at 8, ¶ 26.)

Mr. Yamada testified that AHM engineers, rather than regulation or law, determined the steel grade and fitness used in vehicle components, as well as the mechanism of component attachment. He explained that AHM was aware that using stronger steel allows a vehicle to "withstand greater loading[]" and, therefore, "stronger high-tensile steel materials" will increase cabin strength. *Id.* at 9, ¶ 29. He stated that AHM chose 1,500 megapascal steel in the ninth generation Honda Accord to "improve its crashworthiness[]" and "reduce its weight." *Id.* ¶ 31. In the tenth generation Honda Accord, AHM used "a greater amount of high-tensile steel" to improve the ACE Structure, *id.* ¶ 32, and, in response to the small overlap test, increased the cabin strength, the "strength between the lower member and side frame[,]" *id.* at 10, ¶ 33, and the width of the front bumper beam for improved "efficiency to . . . absorb energy." (Doc. 55-20 at 25.)

The Vermont State Police Crash Reconstruction Team (the "VSP Crash Reconstruction Team") performed a reconstruction of the Accident and concluded that "the left front bumper/grill of the Subaru struck the left front bumper/grill of the Accord in a frontal offset collision." (Doc. 55 at 3, ¶ 9.)

### III.   The Plaintiff's Expert Witness Opinions.

At trial, Plaintiff intends to call two expert witnesses: Mr. Herbst, to offer opinions regarding "vehicle design," and Dr. Ziejewski, to opine on "accident reconstruction/biomechanics[.]" (Doc. 57 at 13.) AHM does not dispute either expert's qualifications.

### A.   Mr. Herbst's Opinions.

Mr. Herbst opines that the Accord was "defective and unreasonably dangerous due to a structurally inadequate body structure that allow[ed] an excessive amount of intrusion into the occupant compartment in a foreseeable offset frontal crash." (Doc. 55 at 4, ¶ 14) (internal quotation marks omitted). To reach this conclusion, he conducted a FEA using "a publicly available finite element model of the ninth generation Honda Accord" (the "FEA Model"). (Doc. 61 at 14, ¶ 46.) NHTSA had commissioned this same model from EDAG to evaluate crash countermeasures.

With the FEA Model, Mr. Herbst performed a simulation "utilizing a modified deformable barrier with an impact velocity of 70 mph to result in a Delta-V of approximately 35 mph, which created structural failures and the character of deformation similar to what was observed in the [Accord]." *Id.* at 16, ¶ 53. He then "increase[ed] the thickness and yield strength of key body and door structure components (including the shotgun, A-post inner, upper A-pillar inner, firewall toe, inner rocker[,] and door beam) to eliminate discontinuities between the materials strengths of the sheet metal components around the occupant compartment[.]" *Id.* ¶ 54. In addition, he created a "second design which also include[s] extension of the front bumper beam." *Id.* "[U]sing his improvements to [the FEA Model]," Mr. Herbst performed simulations "under the same impact conditions" as used with the baseline FEA Model, *id.* at 17, ¶ 55, and concluded that "the use of stronger structural components would have reduced the level of intrusion into the occupant compartment of the . . . Accord." (Doc. 55 at 6, ¶ 21.)

Mr. Herbst also identified other vehicles, such as the Volvo S60, 2014 Acura MDX, 2014 Honda Odyssey, and 2018 Honda Accord, as alternative designs that could have "dramatically improve[d] the outcome in [the Accident]." *Id.* at 9, ¶ 28 (internal

quotation marks omitted). The Volvo S60 model he relied on was introduced in 2011, while the 2014 Acura MDX development began in 2009 or 2010. He did not test these vehicles, nor can he testify to the Decedent's potential injuries if the 2013 Honda Accord incorporated these vehicle designs. He instead "relied on testing that [he] already had in [his] file and reviewed the vehicle structures and publicly available literature[,]" (Doc. 55-11 at 6, ¶ 26), as well as "publicly available crash testing including IIHS small overlap testing[]" for the Volvo S60, *id.* ¶ 27, and opined that a "reasonably safe design [of the Accord] would have less intrusion than we see in this accident." (Doc. 55 at 10-11, ¶ 32) (internal quotation marks omitted).

Mr. Herbst opines that in the Accident, the "Accord bumper beam was bypassed, and there was lower member separation and structural collapse in the shotgun and A-post which allowed excessive intrusion into [the Decedent's] survival space." (Doc. 61 at 11, ¶ 38.) In addition, "the door beam in the driver's door, which provides a critical load path, was displaced rearward and failed to support the door load path to resist frontal intrusion and lateral intrusion when struck by the Subaru." *Id.* at 11-12, ¶ 39. He asserts that the 2013 Honda Accord had "an inadequate body structure for offset frontal impacts[,]" (Doc. 55-11 at 5, ¶ 16), as the high strength steel components "do not form a complete ring around the door opening, and the forward structures such as the shotgun and A-post are made with low to moderate strength steels." (Doc. 61 at 10-11, ¶ 36.) Had the Accord utilized an improved design, Mr. Herbst contends "the intrusion into [the Decedent's] occupant space would have been reduced[.]" (Doc. 55-11 at 4, ¶ 15.) By simulating crash conditions in his FEA, he purports to compare the performance of an improved design in terms of the reduction of intrusion into the occupant compartment during a collision substantially similar to the Accident.

Mr. Herbst further opines that an improved structural design for the 2013 Honda Accord was "technologically and economically feasible[,]" (Doc. 61 at 12, ¶ 41), as demonstrated by the tenth generation Honda Accord starting in 2018, which included higher grade materials and which expanded the front bumper from the 44-inch width in the ninth generation Honda Accord to a 62-inch width, "a more optimal stress structure

configuration[.]" (Doc. 55-9 at 57.) He highlights AHM's "use of a boron door ring and robust shotgun structure extended directly to a widened bumper" in the 2014 Acura MDX, (Doc. 61 at 12, ¶ 42), and notes the improved structure of the 2014 Honda Odyssey. He also describes that, in its design of the 2011 Volvo S60, Volvo used "high strength steel extensively with robust integration of the vehicle shotgun, door beams that are structurally integrated with the door, and design features to deflect to better manage energy and resist occupant compartment intrusion in offset frontal crashes." *Id.* at 13, ¶ 45.

In support of his opinions, Mr. Herbst relies upon the publicly available FEA Model with "yield and tensile strengths that are in excess of [AHM's] minimums[,]" (Doc. 55-9 at 46), that "has been shown to closely match" the 2013 Honda Accord. (Doc. 55-11 at 12, ¶ 41.) As he notes,

> The NHTSA commissioned EDAG to create a model of the 2013 Honda Accord for use in evaluating structural countermeasures for the oblique offset crash condition. The NHTSA project started with a finite element model of the 2012 Honda Accord which EDAG helped create in a previous project. The 2012 Honda Accord FE[A] model was created using an exemplar Honda Accord. The exemplar vehicle was disassembled. Each component was scanned to define its geometry, measured for thickness, and classified by material type. For the majority of the vehicle components, material data was obtained from physical testing of material samples. Simulations of impact scenarios were then performed and compared to physical crash test data. The 2012 model was then updated to reflect a 2013 Honda Accord by incorporating changes made by Honda for the 2013-2017 Honda Accord, which was once again validated by simulations of impact scenarios that were compared to physical testing.

(Doc. 55 at 7, ¶ 22.)

Mr. Herbst stated that his FEA simulation generated "similar" crash loading conditions to the Accident and resulted in comparable deformation of the occupant compartment. (Doc. 55-11 at 13, ¶ 46.) He "set it in an offset orientation where it's overlapping approximately 11 inches," and did not perform his simulations with greater overlap because they were "not intended to be a recreation" of the Accident, but rather "just sort of a parametric analysis of the scientific experiment to see how the [vehicle]

reacts under one condition and what . . . structural changes [may be made] to improve it under the exact same condition." (Doc. 55-9 at 47-48.) Although Dr. Ziejewski identified the overlap in the Accident as 12.1 inches, according to Mr. Herbst, a simulation at 12 inches would not "be significantly different[.]" *Id.* at 48. Mr. Herbst's FEA "demonstrated that his changes to the structure of the Honda Accord are effective countermeasures that serve to reduce intrusion by approximately 70% even when the severity of the simulated impact is 60% higher energy than the severity of the . . . [A]ccident." (Doc. 61 at 17, ¶ 56.) Mr. Herbst has reviewed the VSP Crash Reconstruction Team's accident reconstruction in forming his opinions.

With respect to the intrusion into the occupant compartment, Mr. Herbst testified that the "ideal situation" is no intrusion, but he is "not saying you have to completely eliminate [intrusion] in order to be a better or an alternate design." (Doc. 55-9 at 31.) Although he has not "defined a line" of reasonably safe intrusion, a reasonably safe design "would have less intrusion" than in the Accident. *Id.* As Plaintiff points out, Mr. Herbst "defers to Dr. Ziejewski on specific injury issues," but "does have the opinion that . . . reducing intrusion into the survival space, will reduce injury probability in a global sense." (Doc. 55 at 12, ¶ 36.)

### B.    Dr. Ziejewski's Opinions.

Dr. Ziejewski claims the nature of the Accident was "consistent" with automotive crash testing performed by the NHTSA, IIHS, and vehicle manufacturers. (Doc. 55-3 at 4, ¶ 12.) Although he did not determine the angles of the vehicles upon impact, he opined that the Accord experienced:

> a narrow (~12 inch) overlap frontal impact with [the Subaru], with the Honda Accord experiencing [contact] from the front left corner to the driver's door, a [Principal Direction of Force ("PDOF")] between 11 and 11:30 o'clock (-30 to -15 degrees), with a PDOF of 21 degrees at the point of maximum engagement between the vehicles when the front of the Subaru struck the driver's door of the Accord[.]

(Doc. 61 at 1-2, ¶ 2.)

In the Accident, "the driver's door of the . . . Accord was crushed into the

occupant compartment where [the Decedent] was seated." *Id.* at 3, ¶ 7. "The defining distinction between [the Accident] and the crash testing is that structural failures of the front structures and driver's door of the [Accord] allowed the striking Subaru to not only reach the occupant compartment, but strike it with such force that it crushed in the driver's door." (Doc. 57 at 2.) Because the Decedent moved forward and to the left at impact, Dr. Ziejewski concluded that her "torso was exposed to door intrusion forward of the torso airbag." (Doc. 55-3 at 4, ¶ 11.)

As the accident reconstruction and biomechanics expert, Dr. Ziejewski opines that "the driver's side door intruded into the driver's survival space," (Doc. 55 at 5, ¶ 15) (internal quotation marks omitted), and the intrusion was "past what is acceptable." *Id.* at 11, ¶ 34 (internal quotation marks omitted). He asserts that "[s]ince [the Decedent] was properly wearing her seatbelt and the airbags deployed, one must conclude her fatal injuries were due to the intrusion of the driver's side door into her survival space." (Doc. 55-2 at 21.) In other words, "[h]ad [the Decedent's] driver-side door not intruded into her survival space, her injuries would have been minimal, such as those sustained by the front right passenger whose door did not intrude into his survival space." *Id.*

Dr. Ziejewski testified that the intrusion "into and over the seat cushion" was also unacceptable and explains "how the door intrusion caused" the Decedent's injuries, "the likelihood of any injuries" without the door intrusion, and that, "from a biomechanical perspective, . . . intrusion should be prevented or limited from an injury prevention perspective." (Doc. 55 at 11-12, ¶ 35.) For this reason, he opines that "had the [Accord] been equipped with a design that prevented or substantially reduced the driver's side door intrusion into the occupant space, [the Decedent] would not have sustained any fatal or life-altering injuries as a result of this incident." (Doc. 55-3 at 4, ¶ 12.)

## IV.    AHM's Challenges to Plaintiff's Expert Witness Opinions.

AHM contends that neither Mr. Herbst nor Dr. Ziejewski should be permitted to testify at trial because neither has offered an admissible opinion on the issue of causation. AHM points out that the angle of the vehicles at impact was "unlike any standard mandatory or voluntary industry testing[,]" (Doc. 61 at 2, ¶ 3), and the 2013 Honda

Accord met or exceeded occupant protection safety standards. It contends that there is no evidence "that a longer front bumper beam would have engaged in this accident[,]" *id.* at 61 at 11, ¶ 38, and claims that "97% of the front structure components of Mr. Herbst's FEA model do not match the tensile strength or geometry of the 2013 Honda Accord." (Doc. 55 at 7, ¶ 22.) Dr. Ziejewski conceded that the "injury parameters" were "very good" in the IIHS small overlap test and NHTSA experimental offset oblique tests. *Id.* at 6, ¶ 19 (internal quotation marks omitted).

AHM further argues that Mr. Herbst's FEA simulation was run at higher speeds than the Accident, is unrepresentative of the impact angle, and "has less overlap than Dr. Ziejewski opines the . . . [A]ccident had." *Id.* at 8, ¶ 25. AHM points out that "[i]t is not required that a vehicle allow zero intrusion into the occupant compartment during a collision to be considered reasonably safe." *Id.* at 10, ¶ 31.

AHM argues that Dr. Ziejewski "cannot testify to what the acceptable level of intrusion would be[,]" *id.* at 11, ¶ 35, and Mr. Herbst "cannot quantify the amount of intrusion into the occupant compartment that would represent reasonable safety." *Id.* ¶ 33. It seeks to preclude the experts' testimony because neither expert analyzed "whether less intrusion into the occupant compartment of the . . . Accord would have minimized [the Decedent's] injuries[.]" (Doc. 55 at 12-13, ¶¶ 36-39.) As a result, it contends those experts cannot opine as to whether any of the proposed alternative designs would have prevented the Decedent's fatality. AHM cites the following testimony as illustrative of what it characterizes as a failure of proof:

Testimony of Brian Herbst:

> Q. And along with what you told me earlier, you haven't performed any analysis to assess how [the Decedent's] injuries may have been different or less severe had there been some lesser intrusion into the occupant compartment?

> A. No. I mean, my role has been primarily to assess the intrusion that there was there and the effects of alternative designs on that and how that could be reduced. As far as how that relates to injury reduction, I defer to Dr. Ziejewski from specific injury issues. I mean, for a – I do have the opinion, in general, that, obviously,

maintaining survival space, reducing intrusion into the survival space areas, will reduce injury probability, again, in a global sense, but as far as her specific injuries, I defer to Dr. Ziejewski.

. . .

Q. Have you done any analysis to determine what [the Decedent's] injuries would have been had the 2013 Accord incorporated any of those three designs structures that we just identified, whether it's the [2011 Volvo] S60, the [2014 Acura] MDX, or the 201[8] Accord?

A. No. I defer to Dr. Ziejewski on any injury opinions.

Testimony of Dr. Mariusz Ziejewski:

Q. You didn't perform any analysis of the likely injuries that would have been sustained at various levels of intrusion; is that correct?

A. No. There's no need for that.

. . .

Q. [Y]ou can't say what injuries would have been sustained if the intrusion had been, say, 10% less, correct?

A. I don't know. I have to think about it. If—if I have to think about it, how I would answer that. You're asking what information I would need.

Q. Is it fair to say that you're not offering the opinion that there is some alternative design of the vehicle that would have prevented [the Decedent] from sustaining these injuries?

A. If there would be no contact with the side door, there would be no injuries. The level of the acceleration of this angle, it's no big deal.

. . .

Q. And is it also fair to say you're not offering an opinion that there's an alternative design that would have prevented any of the intrusion that you saw into the occupant compartment; is that true?

A. I don't deal with that, the design and level of intrusion. What I deal with – if you don't give me intrusion, if you don't give me impact to the door, we wouldn't be here.

(Doc. 46-1 at 6-7) (fourth and fifth alterations in original).

## V.    Conclusions of Law and Analysis.

### A.    Whether Plaintiff's Expert Witness Opinions Must Be Excluded.

Where "the nexus between the injury and the alleged cause would not be obvious to the lay juror, expert evidence is often required to establish the causal connection

between the accident and some item of physical or mental injury." *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 46 (2d Cir. 2004) (alteration adopted) (citation and internal quotation marks omitted). Under Federal Rule of Evidence 702:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

Rule 702 requires the court to serve as a gatekeeper for expert testimony, "ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand." *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993).

In determining the reliability of expert testimony, the court engages in "a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue." *Id.* at 592-93. Under *Daubert* and its progeny, relevant factors include:

> (1) whether a theory or technique "can be (and has been) tested," (2) "whether the theory or technique has been subjected to peer review and publication,"; (3) a technique's "known or potential rate of error," and "the existence and maintenance of standards controlling the technique's operation,"; and (4) whether a particular technique or theory has gained "general acceptance" in the relevant scientific community[.]

*Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir. 2002) (quoting *Daubert*, 509 U.S. at 593-94) (citations omitted). "[T]he test of reliability is 'flexible,' and *Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case." *Restivo v. Hessemann*, 846 F.3d 547, 576 (2d Cir. 2017) (internal quotation marks omitted) (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999)).

"[W]hen an expert opinion is based on data, a methodology, or studies that are

12

simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266. For this reason, expert testimony should be excluded "if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and oranges comparison[.]" *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (citations and internal quotation marks omitted). "Other contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 214 (2d Cir. 2009) (alteration adopted) (internal quotation marks omitted); *see also Green Mountain Chrysler Plymouth Dodge Jeep v. Crombie*, 508 F. Supp. 2d 295, 312 (D. Vt. 2007) ("Overall, the Supreme Court has emphasized the 'liberal thrust' of the Federal Rules of Evidence with regard to expert opinion testimony.") (citing *Daubert*, 509 U.S. at 588).

The court has "broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination." *Kumho Tire Co.*, 526 U.S. at 142 (emphasis in original); *see also Amorgianos*, 303 F.3d at 265 ("[T]he district court has broad discretion in determining what method is appropriate for evaluating reliability under the circumstances of each case."). Plaintiff, as the proponent of the expert witness testimony, must establish its admissibility. *See In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d 396, 411 (S.D.N.Y. 2016) ("The party offering the [expert] testimony has the burden of establishing its admissibility by a preponderance of the evidence.").

In determining whether an expert witness' testimony is admissible, "the district court should undertake a rigorous examination of the facts on which the expert relies, the method by which the expert draws an opinion from those facts, and how the expert applies the facts and methods to the case at hand." *Amorgianos*, 303 F.3d at 267. The court must "make certain that an expert, whether basing [his or her] testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 265-66 (internal quotation marks omitted) (quoting *Kumho Tire Co.*, 526 U.S. at 152).

Courts may exclude expert witness opinions when the moving party demonstrates that those opinions are inadmissible and may grant summary judgment if "the admissible evidence is insufficient to permit a rational juror to find in favor of the plaintiff[.]" *Id.* at 267; *see also Brooks v. Outboard Marine Corp.*, 234 F.3d 89, 92 (2d Cir. 2000) (affirming the district court's exclusion of expert testimony and grant of summary judgment). "The standard for admissibility is the same at the summary judgment stage as it is at trial." *In re Mirena IUD Prods. Liab. Litig.*, 169 F. Supp. 3d at 411; *see also Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 143 (1997) ("On a motion for summary judgment, disputed issues of fact are resolved against the moving party[.] . . . But the question of admissibility of expert testimony is not such an issue of fact[.]").

### 1.    Whether Mr. Herbst's Opinions Are Admissible.

Plaintiff seeks to introduce Mr. Herbst's opinions that the Accord was "defective and unreasonably dangerous due to a structurally inadequate body structure that allow[ed] an excessive amount of intrusion into the occupant compartment in a foreseeable offset frontal crash." (Doc. 55 at 4, ¶ 14) (internal quotation marks omitted).[1] AHM argues that Mr. Herbst's opinions must be excluded for the following reasons: (1) the FEA Model used in his simulations is unrepresentative of the Accord, (2) his simulated crash tests and the IIHS small overlap test differ from the Accident, (3) his FEA testing results do not determine the injuries the Decedent would have obtained with less intrusion into the occupant compartment, and (4) he did not physically test any of the alternate vehicle designs.

---

[1] The court reserves judgment as to whether an expert witness will be permitted to present a legal conclusion as an opinion at trial. *See Grajeda v. Vail Resorts Inc.*, 2022 WL 17417521, at *4 (D. Vt. Dec. 5, 2022) ("It is well-established that 'although an expert may opine on an issue of fact within the jury's province, he may not give testimony stating ultimate legal conclusions based on those facts.'") (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991)); *see also McLaughlin v. Langrock, Sperry & Wool, LLP*, 2020 WL 3118646, at *7 (D. Vt. June 12, 2020) ("Fed. R. Evid. 704(a) provides that '[a]n opinion is not objectionable just because it embraces an ultimate issue.' However, expert testimony that states a legal conclusion or 'communicat[es] a legal standard—explicit or implicit—to the jury' is inadmissible.") (brackets in original) (quoting *Hygh v. Jacobs*, 961 F.2d 359, 364 (2d Cir. 1992)).

AHM claims that the FEA Model[2] Mr. Herbst used is unreliable because "97% of [its] front structure components" do not match the 2013 Honda Accord's tensile strength or geometry. *Id.* at 7, ¶ 22. Experts may rely on a wide range of information in forming their opinions provided it is the kind of information upon which "experts in the particular field would reasonably rely[.]" Fed. R. Evid. 703. The FEA Model was publicly available, commissioned by the NHTSA, and AHM's challenge to it is based on its own expert witness' opinions. Plaintiff contends:

> The NHTSA commissioned the creation of the model of the 2013 Honda
> Accord for use in evaluating structural countermeasures for the oblique
> offset crash condition. The NHTSA project started with a finite element
> model of the 2012 Honda Accord using an exemplar Honda Accord that
> was disassembled, scanned to define geometry, measured for thickness, and
> classified by material type. For the majority of the vehicle components,
> material data was obtained from physical testing of material samples.
> Simulations of impact scenarios were then performed and compared to
> physical crash test data. The 2012 model was then updated to reflect a 2013
> Honda Accord by incorporating changes made by Honda for the 2013-2017
> Honda Accord, which was once again validated by simulations of impact
> scenarios that were compared to physical testing. As such, NHTSA's finite
> element model of the 2013-2017 Honda Accord is clearly representative of
> the Honda Accord."

(Doc. 57 at 14-15) (citations omitted).

Based upon the evidence presented, there are sufficient similarities between the FEA Model and the 2013 Honda Accord to render the FEA Model a reliable basis for Mr. Herbst's opinions. Any inconsistencies may be explored on cross examination but do not preclude admissibility. *See Amorgianos*, 303 F.3d at 267 ("[V]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") (citing *Daubert*, 509 U.S. at 596) (internal quotation marks omitted).

---

[2] In opposition to AHM's argument regarding the FEA Model, Plaintiff cites an order from *Skoda v. American Honda Motor Co.*, in which the Circuit Court of Mobile County, Alabama denied a motion to exclude Mr. Herbst's opinions after a hearing. The court's analysis is not included in the ruling.

AHM next asserts that the 2013 Honda Accord's performance in the IIHS small overlap test and Mr. Herbst's FEA simulations are unreliable because they do not mirror the Accident. Plaintiff counters that Mr. Herbst did not intend to recreate the Accident in his FEA simulations but instead analyzed "how the [vehicle] reacts under one condition and what . . . structural changes . . . improve it under the exact same condition." Doc. 55-9 at 48. The FEA simulations created crash-loading conditions similar to the Accident and a deformation similar to what was observed post-Accident in the Accord. *See Whitten v. Michelin Ams. Rsch. & Dev. Corp.*, 2008 WL 2943391, at *6 (W.D. Tenn. July 25, 2008) (holding that an expert's "inability to create a test substantially similar to [p]laintiffs' crash does not render his opinion unreliable[]" because he "stated that the purpose of the [experiment] was not to recreate the accident[]" and the testing "is widely used throughout the automobile industry"). In support of his opinion, Mr. Herbst relies on Dr. Ziejewski's accident reconstruction and has considered the VSP Crash Reconstruction Team's accident reconstruction as well. Mr. Herbst contends that any differences in vehicle angles at impact or the overlap length are immaterial. As a result, how the Accord would have performed with structural changes remains relevant to whether, without those changes, it was defective and unreasonably dangerous and whether an alternative design was feasible.

AHM seeks exclusion on the further ground that Mr. Herbst failed to analyze what degree of "lesser intrusion" would have minimized the Decedent's injuries. However, "each expert need not, alone, establish causation[.]" *Aurigemma v. Costco Wholesale Corp.*, 2023 WL 197044, at *8 (D. Conn. Jan. 17, 2023). Mr. Herbst is a vehicle design expert. Dr. Ziejewski is a biomechanical expert. *See White v. Ford Motor Co.*, 2021 WL 2826458, at *5 (N.D. Ala. July 7, 2021) (denying a motion to exclude Mr. Herbst's testimony despite defendant's argument that his testing did not determine whether plaintiff's injuries were preventable). Mr. Herbst nonetheless opines that "maintaining survival space, reducing intrusion into the survival space areas, will reduce injury probability[.]" (Doc. 46-1 at 7.) For the purposes of his opinion, this degree of specificity is acceptable. *See Zaremba v. Gen. Motors Corp.*, 360 F.3d 355, 359 (2d Cir. 2004)

16

("[T]o provide relevant testimony, [the expert] must . . . establish that his hypothetical design would have resulted in *greater safety* in the . . . accident at issue.") (emphasis supplied).[3] He defers to Dr. Ziejewski for a more specific opinion.

To the extent Mr. Herbst considered alternative vehicle designs, including the Volvo S60, 2014 Acura MDX, 2014 Honda Odyssey, and 2018 Honda Accord that could have "dramatically improve[d] the outcome" in the Accident, (Doc. 55 at 9, ¶ 28) (internal quotation marks omitted), he did not conduct new testing but relied on testing "[he] already had in [his] file[,]" (Doc. 55-11 at 6, ¶ 26), publicly available literature, a review of the vehicle structures, and publicly available crash testing. His decision to not conduct new testing does not preclude his opinions because "[t]he Federal Rules of Evidence specifically provide that an expert may rely on facts or data 'perceived by *or* made known to the expert at or before the hearing.' . . . The expert need not have conducted her own tests." *Gussack Realty Co. v. Xerox Corp.*, 224 F.3d 85, 94-95 (2d Cir. 2000) (emphasis in original) (citing Fed. R. Evid. 703); *see Joiner*, 522 U.S. at 146 ("Trained experts commonly extrapolate from existing data.").

At trial, Mr. Herbst may testify to vehicle designs that were available at the time of the Accident. *See Cummins ex rel. C.A.P. v. BIC USA, Inc.*, 2011 WL 1399768, at *6 (W.D. Ky. Apr. 13, 2011) ("[A]n alternative design that has been widely used in another product can be presumed to have been tested."). Because he does not provide a detailed development timeline for vehicles such as the 2014 Honda Odyssey and 2018 Honda Accord, Plaintiff must establish those designs were available at the time of the development of the 2013 Honda Accord before Mr. Herbst may testify to them. Within these limitations, Mr. Herbst's opinions are admissible under Rule 702 and the court

---

[3] *Cf. Urena v. ConAgra Foods, Inc.*, 2020 WL 3051558, at *9 (E.D.N.Y. June 8, 2020) (granting a motion to exclude an expert's opinions in part because the expert's alternative design "would have made no actual difference with respect to the accident at issue here and therefore cannot be found to be a safer alternative"); *Florentino v. Am. Lifts & REM Sys., Inc.*, 2008 WL 11417177, at *6 (E.D.N.Y. Apr. 15, 2008) (holding an expert's opinions inadmissible because he "did not test any alternate design or offer any calculations to show that the alternative designs would have prevented [a hand truck handle] bolt from breaking and the handle from partially detaching under the range of circumstances that might have converged to cause plaintiff's injury").

DENIES AHM's motion to exclude them.

### 2. Whether Dr. Ziejewski's Opinions Are Admissible.

Accident reconstruction and biomechanics expert Dr. Ziejewski opined that the "driver's side door intruded into the driver's survival space," this intrusion was "past what is acceptable[,]" it caused the Decedent's fatality, and had the "driver-side door not intruded into her survival space, her injuries would have been minimal." (Doc. 55 at 5, 11, ¶¶ 15, 34) (internal quotation marks omitted). Stated slightly differently in his declaration, "had the [Accord] been equipped with a design that prevented or substantially reduced the driver's side door intrusion into the occupant space," the Decedent would not have died. (Doc. 55-3 at 4, ¶ 12.) AHM claims these opinions are speculative because Dr. Ziejewski did not analyze whether "less intrusion . . . would have minimized or prevented" the Decedent's injuries nor demonstrated an "acceptable level" of intrusion. (Doc. 60 at 5; Doc. 55 at 11, ¶ 35.)

As a threshold matter, courts in the Second Circuit typically allow biomechanical engineers to testify only to general causation, "i.e., whether the force sustained by a 'plaintiff in the subject accident could potentially cause certain injuries.'" *Thomas v. YRC Inc.*, 2018 WL 919998, at *5 (S.D.N.Y. Feb. 14, 2018) (citation and emphasis omitted). A biomechanical engineer without a medical degree or training is therefore generally not allowed to "testify regarding whether a specific accident caused or contributed to a plaintiff's injuries." *Gade v. State Farm Mut. Auto. Ins. Co.*, 2015 WL 7306433, at *15 (D. Vt. Nov. 19, 2015) (footnote omitted).[4]

---

[4] *See also Grajeda v. Vail Resorts Inc.*, 2023 WL 4803755, at *12 (D. Vt. July 27, 2023) (excluding an expert's specific causation opinion because "he does not have a medical degree or formal medical training[, so he] is therefore unqualified to 'venture into the realm of medical diagnosis by reviewing [Plaintiff's] primary medical records and opining as to the extent of his injuries.'") (second alternation in original) (citing *Rodriguez v. Athenium House Corp.*, 2013 WL 796321, at *5 (S.D.N.Y. Mar. 5, 2013)) (collecting cases in footnote); *Bennett v. Target Corp.*, 2019 WL 7556361, at *7 (E.D.N.Y. Jan. 2, 2019) (agreeing with courts in the Southern District of New York that without medical training, "biomechanical engineers are not qualified to testify as to whether an accident caused or contributed to any of plaintiff's injuries, as this would amount to a medical opinion") (alteration adopted) (internal quotation marks omitted).

Although Dr. Ziejewski is a clinical faculty member and adjunct professor in a medical school's clinical neuroscience department, unless he has a medical degree or formal medical training, he will not be permitted to testify regarding specific causation. *See Burke v. TransAm Trucking, Inc.*, 617 F. Supp. 2d 327, 334 (M.D. Pa. 2009) ("Dr. Ziejewski may not testify as to the extent of injuries suffered by Plaintiff, which would require the identification and diagnosis of a medical condition, but may testify that the force sustained by Plaintiff in the subject accident could potentially cause certain injuries as this amounts to a biomechanical determination."). His opinions regarding the mechanism of Plaintiff's injury are not framed as general causation opinions "about the nature and amount of force generated by the accident in question and the observed effect of that force on a human body in comparable accidents." *Morgan v. Girgis*, 2008 WL 2115250, at *6 (S.D.N.Y. May 16, 2008). "Instead, they purport to opine as to the specific cause of Plaintiff's injuries." *Grajeda v. Vail Resorts Inc.*, 2023 WL 4803755, at *11 (D. Vt. July 27, 2023).

To support his opinions, Dr. Ziejewski relied in part on Mr. Herbst's "analysis of physical crash testing of existing alternative designs and his computer simulated testing of his alternatively designed Honda Accord[.]" (Doc. 57 at 12.) An "expert is permitted to rely on facts, opinions, and data not of the expert's own making—including analyses performed or findings made by another expert in the case[.]" *U.S. Bank Nat'l Ass'n v. PHL Variable Life Ins. Co.*, 112 F. Supp. 3d 122, 131 (S.D.N.Y. 2015). Dr. Ziejewski thus need not have performed his own structural analysis.[5]

---

[5] *See also Kim v. Am. Honda Motor Co.*, 2022 WL 1604778, at *2 (E.D. Tex. May 19, 2022), *aff'd*, 86 F.4th 150 (5th Cir. 2023) (allowing Dr. Ziejewski's testimony despite defendant's arguments that he did not "perform a risk-utility analysis regarding [another expert's] alternative designs but merely cosigns their viability" because "Dr. Ziejewski is not responsible for proving [that a safer alternative design existed.] . . . [His] expert opinion is one method by which Plaintiffs hope to prove this element to the jury, but ultimately, the jury will assign the weight, if any, to the expert opinion.") (internal quotation marks omitted); *Aggarwal v. Toyota Motor Corp.*, 2020 WL 1942781, at *3 (W.D. Tex. Mar. 9, 2020) (denying a motion to exclude Dr. Ziejewski's testimony because his "opinions are more than mere speculation. . . . [They] are based [on] the application of math and physics to previously-run tests and data."); *Fox v. Gen.*

Based on Mr. Herbst's opinions that an alternative design would have reduced intrusion, Dr. Ziejewski opined that "a design that prevented or substantially reduced" intrusion would have, in turn, prevented the Decedent's fatality. (Doc. 55-3 at 4, ¶ 12.) Dr. Ziejewski's lack of an opinion about what specific lesser injuries would have occurred with an alternate design is consistent with confining his opinion to general causation and does not render his opinions inadmissible because he opines that a fatality would be avoided and injuries would be minimal.

"It is valid for an expert to infer causation based on the totality of evidence when combined it supports such an inference." *Drake v. Allergan, Inc.*, 111 F. Supp. 3d 562, 568 (D. Vt. 2015) (stating that "[a]lthough no single piece of evidence necessarily may have been conclusive in isolation, together it paints a picture sufficient to support the jury's finding on medical causation"). Here, Dr. Ziejewski's opinion is further supported by the difference between the Decedent's injuries and those of her passenger as well as the other driver. Accordingly, there is not "too great an analytical gap" for Dr. Ziejewski to rely on Mr. Herbst's conclusion that if the design permitted less intrusion into the occupant compartment space, the injuries the Decedent suffered would be minimal and a fatality would have been avoided. *Joiner*, 522 U.S. at 146. No greater degree of precision is required under Rule 702.

The court therefore DENIES AHM's motion to exclude Dr. Ziejewski's opinions, however, Dr. Ziejewski shall not provide an opinion on specific causation.

## B.    Whether AHM is Entitled to Summary Judgment.

Plaintiff asserts strict liability for design defect and negligence claims pursuant to the court's diversity jurisdiction, 28 U.S.C. § 1332. As a result, Vermont's substantive law governs. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938); *see also Omega Eng'g, Inc. v. Omega, S.A.*, 432 F.3d 437, 443 (2d Cir. 2005) ("In a diversity case [federal courts] apply the substantive law of the forum state[.]").

---

*Motors LLC*, 2019 WL 3483171, at *11 (N.D. Ga. Feb. 4, 2019) ("Whether [Dr. Ziejewski] should have performed his own testing goes to the weight of the opinion, not admissibility.").

1.    **Standard of Review.**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that "'might affect the outcome of the suit under the governing law[,]'" *Rodriguez v. Vill. Green Realty, Inc.*, 788 F.3d 31, 39 (2d Cir. 2015) (internal quotation marks omitted) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), while "[a] dispute of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* at 39-40 (quoting *Anderson*, 477 U.S. at 248). On a motion for summary judgment, the court "constru[es] the evidence in the light most favorable to the nonmoving party and draw[s] all reasonable inferences in his [or her] favor." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying" the evidence "which it believes demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). "When the moving party has carried its burden, its opponent must produce "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson*, 477 U.S. at 249. "A non-moving party cannot avoid summary judgment simply by asserting a 'metaphysical doubt as to the material facts.'" *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 75 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

In adjudicating a motion for summary judgment, the district court's role "is not to resolve disputed questions of fact but only to determine whether, as to any material issue, a genuine factual dispute exists." *Kaytor v. Elec. Boat Corp.*, 609 F.3d 537, 545 (2d Cir. 2010). If the evidence "presents a sufficient disagreement to require submission to a jury[,]" the court should deny summary judgment. *Anderson*, 477 U.S. at 251-52. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Proctor v. LeClaire*, 846 F.3d 597, 608 (2d Cir. 2017) (citation and internal quotation marks omitted). Not all

disputed issues of fact, however, preclude summary judgment. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### 2.       Whether There is a Genuine Dispute of Material Fact.

AHM argues that it is entitled to summary judgment because Plaintiff failed to establish a *prima facie* case that a design defect in the Accord proximately caused the Decedent's fatality.

"[S]trict liability imposes liability based on causation, but without fault or negligence in the traditional sense." *Gilman v. Towmotor Corp.*, 621 A.2d 1260, 1263 (Vt. 1992). Pursuant to Vermont law, "a manufacturer is strictly liable for physical harm or property damages resulting from a defective product that reaches a user without undergoing substantial change." *Webb v. Navistar Int'l Transp. Corp.*, 692 A.2d 343, 346 (Vt. 1996). The defective product must be "dangerous to an extent beyond that which would be contemplated by an ordinary consumer." *Id.* at 347. "The plaintiff bears the burden of proving that the product is defective, and that its defect was the proximate cause of the harm[.]" *Id.* "While under Vermont law, circumstantial evidence may be accepted in a products liability action, more than a mere possibility, suspicion[,] or surmise of a defect is required to survive summary judgment." *Griffin v. Lincare, Inc.*, 2016 WL 3945183, at *4 (D. Vt. July 19, 2016) (citation and internal quotation marks omitted).

To allege a negligence claim, a plaintiff must establish four elements: "(1) that it was owed a legal duty by the defendant; (2) that the defendant breached that duty; (3) that the defendant's conduct was the proximate cause of the plaintiff's injuries; and (4) that the plaintiff suffered actual damage as a result of the negligence." *Hartford Fire Ins. Co. v. Light Corp.*, 2022 WL 392844, at *3 (D. Vt. Feb. 8, 2022) (citing *Knight v. Rower*, 742 A.2d 1237, 1242 (Vt. 1999)).

Under Vermont law,

> causation requires both "but-for" and proximate causation. Thus, the plaintiff must first show that the harm would not have occurred "but for"

the defendant's conduct such that the "tortious conduct [was] a necessary condition for the occurrence of the plaintiff's harm." The plaintiff must also show that the defendant's negligence was "legally sufficient to result in liability," such that "liability attaches for all the injurious consequences that flow [from the defendant's negligence] until diverted by the intervention of some efficient cause that makes the injury its own."

*Collins v. Thomas*, 2007 VT 92, ¶ 8, 182 Vt. 250, 253-54, 938 A.2d 1208, 1211 (citations omitted) (alterations in original).

In this case, there is a genuine dispute of material fact as to causation. Plaintiff's experts opine that, had alternative available designs been utilized, the intrusion in the occupant's compartment would have been reduced and the Decedent's injuries would have been minimal. AHM contends these opinions are unreliable and do not suffice to establish its negligence or an unreasonably dangerous design defect in the Accord. It cites its own expert witness opinions and testing results to support these contentions.

Drawing all reasonable inferences in Plaintiff's favor, a reasonable jury could conclude that AHM could have designed the 2013 Honda Accord to create less intrusion into the occupant compartment, and it would have prevented the Decedent's fatality. Plaintiff has therefore "present[ed] a sufficient disagreement to require submission to a jury" on the issue of causation. *Anderson*, 477 U.S. at 251-52; *see Collins*, 2007 VT 92, ¶ 8, 182 Vt. at 254, 938 A.2d at 1211 ("[P]roximate cause 'ordinarily' is characterized as 'a jury issue[.]'") (quoting *Est. of Sumner v. Dep't of Soc. & Rehab. Servs.*, 649 A.2d 1034, 1036 (Vt. 1994) (mem.)). Pursuant to Fed. R. Civ. P. 56, summary judgment is therefore inappropriate.

## CONCLUSION

The court DENIES AHM's motion to exclude the testimony of Mr. Herbst and Dr. Ziejewski and DENIES AHM's motion for summary judgment. (Doc. 46.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this _15th_ day of May, 2024.

Christina Reiss, District Judge
United States District Court